UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANTINO ZECHRIAH DEANDA, | No.  2:18-cv-01029 WBS KJN |
| Petitioner, | |
| v. | FINDINGS & RECOMMENDATIONS |
| C. KOENIG, Warden, | |
| Respondent. | |

I.  Introduction

Petitioner is a state prisoner, proceeding without counsel, with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2012 conviction for numerous sex offenses involving his stepdaughter and for child pornography.  Petitioner was sentenced to 85 years-to-life plus 13 years in state prison.  Petitioner claims the following: denial of his right to a speedy trial (ground 2); denial of the right to an impartial jury (ground 3); lack of confrontation by all witnesses (ground 4); not all favorable witnesses to the defense were presented (ground 5); ineffective assistance of counsel (ground 6); and denial of the right to counsel of choice (ground 7).  After careful review of the record, this court concludes that the petition should be denied.

//

//

1

1  II.  <u>Procedural History</u>

2          On April 26, 2012, a jury found petitioner guilty of four counts of oral copulation with a

3  child 10 years of age or under (Cal. Pen. Code, § 288.7(b) [counts 5-8]), one count of sodomy

4  with a child 10 years of age or under (Cal. Pen. Code, § 288.7(a) [count 10]), attempted sodomy

5  with a child (Cal. Pen. § 664/288.7(a) [count 9]), lewd act with a child under 14 years of age (Cal.

6  Pen. Code § 288(a) [count 4]), exhibiting lewd material to a minor (Cal. Pen. Code, § 288.2(a)

7  [count 1]), causing a minor to pose/model for pornography (Cal. Pen. Code, § 311.4(c) [count 2]),

8  and possession of obscene matter depicting a minor with intent to distribute (Cal. Pen. Code, §

9  311.1(a) [count 3]).  (2 LD 2 at 31-34; 2 LD 8 at 39-43.)[1]  On June 1, 2012, petitioner was

10  sentenced to 85 years-to-life plus a determinate consecutive term of 13 years in state prison.  (1

11  LD 1; 2 LD 8 at 71-85.)

12          Petitioner appealed the conviction to the California Court of Appeal, Third Appellate

13  District.  The Court of Appeal affirmed the conviction on February 21, 2017.  (1 LD 2; 2 LD 12.)

14          Petitioner filed a petition for review in the California Supreme Court (1 LD 3), which was

15  denied on April 26, 2017.  (1 LD 4.)

16          On April 24, 2018, petitioner filed a petition for writ of habeas corpus with the California

17  Supreme Court.  (1 LD 5; 2 LD 14.)  The following day, petitioner filed his petition for writ of

18  habeas corpus in this court.  (ECF No. 1.)

19          On August 15, 2018, the California Supreme Court denied the habeas petition.  (1 LD 6.)

20          In January 2019, respondent moved to dismiss the instant federal habeas petition as a

21  mixed petition of exhausted and unexhausted claims.  (ECF No. 9.)  On June 7, 2019, the

22  undersigned issued findings and recommendations, determining claims 1, 8 and 9 were

23  unexhausted and should be dismissed, but that claims 2 through 7 could proceed as those claims

24  had been exhausted in the state courts.  (ECF No. 20 at 4-8.)

25  _____

26  [1] "1 LD" refers to the first set of documents lodged by respondent on January 4, 2019
(simultaneous with motion to dismiss); "2 LD" refers to the second set of documents lodged by

27  respondent on July 22, 2019 (following court order of same date); "ECF" refers to the docket in
this matter maintained by the court's CM/ECF system.  Specific page number references are to

28  those numbers assigned by the CM/ECF system.

2

1    District Judge William J. Shubb issued an order adopting the findings and

2    recommendations in full on July 22, 2019.  (ECF No. 22.)

3    Thereafter, on August 12, 2019, respondent filed an answer to the exhausted claims

4    (grounds 2-7).  (ECF No. 25.)  Petitioner did not file a traverse or reply to respondent's answer.

5    III.  Facts

6    Petitioner was found guilty of ten sexual offenses involving sexual acts and child

7    pornography involving his wife's ten-year-old daughter.  Specific facts will be addressed as to

8    each claim where necessary.

9    IV.  Standards for a Writ of Habeas Corpus

10    An application for a writ of habeas corpus by a person in custody under a judgment of a

11    state court can be granted only for violations of the Constitution or laws of the United States.  28

12    U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or

13    application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502

14    U.S. 62, 67-68 (1991).

15    Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

16    corpus relief:

17
18
19
> An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted
> with respect to any claim that was adjudicated on the merits in State
> court proceedings unless the adjudication of the claim -

20
21
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or

22
23
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

24    28 U.S.C. § 2254(d).

25    For purposes of applying § 2254(d)(1), "clearly established federal law" consists of

26    holdings of the United States Supreme Court at the time of the last reasoned state court decision.

27    Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, 132 S. Ct.

28    38, 44-45 (2011)); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v.

1   Taylor, 529 U.S. 362, 412 (2000)).  Circuit court precedent "may be persuasive in determining

2   what law is clearly established and whether a state court applied that law unreasonably."  Stanley,

3   633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit

4   precedent may not be "used to refine or sharpen a general principle of Supreme Court

5   jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced."  Marshall

6   v. Rodgers, 569 U.S. 58, 64 (2013) (citing Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012) (per

7   curiam)).  Nor may it be used to "determine whether a particular rule of law is so widely accepted

8   among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as

9   correct.  Id.  Further, where courts of appeals have diverged in their treatment of an issue, it

10  cannot be said that there is "clearly established Federal law" governing that issue.  Carey v.

11  Musladin, 549 U.S. 70, 77 (2006).

12      A state court decision is "contrary to" clearly established federal law if it applies a rule

13  contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

14  precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640 (2003).

15  Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the

16  writ if the state court identifies the correct governing legal principle from the Supreme Court's

17  decisions, but unreasonably applies that principle to the facts of the prisoner's case. [2]  Lockyer v.

18  Andrade, 538 U.S. 63, 75 (2003); Williams v. Taylor, 529 U.S. at 413; Chia v. Cambra, 360 F.3d

19  997, 1002 (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ simply

20  because that court concludes in its independent judgment that the relevant state-court decision

21  applied clearly established federal law erroneously or incorrectly.  Rather, that application must

22  also be unreasonable."  Williams v. Taylor, 529 U.S. at 411.  See also Schriro v. Landrigan, 550

23  U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its

24  'independent review of the legal question,' is left with a '"firm conviction"' that the state court

25  was '"erroneous"'").  "A state court's determination that a claim lacks merit precludes federal

26  ────────────────

27  [2]   Under § 2254(d)(2), a state court decision based on a factual determination is not to be
    overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
    presented in the state court proceeding."  Stanley, 633 F.3d at 859 (quoting Davis v. Woodford,

28  384 F.3d 628, 638 (9th Cir. 2004)).

4

1  habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's

2  decision." <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011) (quoting <u>Yarborough v. Alvarado</u>, 541

3  U.S. 652, 664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal

4  court, a state prisoner must show that the state court's ruling on the claim being presented in

5  federal court was so lacking in justification that there was an error well understood and

6  comprehended in existing law beyond any possibility for fair-minded disagreement." <u>Richter</u>,

7  562 U.S. at 103.

8       If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

9  court must conduct a de novo review of a habeas petitioner's claims. <u>Delgadillo v. Woodford</u>,

10  527 F.3d 919, 925 (9th Cir. 2008); <u>see also</u> <u>Frantz v. Hazey</u>, 533 F.3d 724, 735 (9th Cir. 2008)

11  (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of

12  § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

13  considering de novo the constitutional issues raised").

14       The court looks to the last reasoned state court decision as the basis for the state court

15  judgment. <u>Stanley</u>, 633 F.3d at 859; <u>Robinson v. Ignacio</u>, 360 F.3d 1044, 1055 (9th Cir. 2004).

16  If the last reasoned state court decision adopts or substantially incorporates the reasoning from a

17  previous state court decision, this court may consider both decisions to ascertain the reasoning of

18  the last decision. <u>Edwards v. Lamarque</u>, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a

19  federal claim has been presented to a state court and the state court has denied relief, it may be

20  presumed that the state court adjudicated the claim on the merits in the absence of any indication

21  or state-law procedural principles to the contrary." <u>Richter</u>, 562 U.S. at 99.  This presumption

22  may be overcome by a showing "there is reason to think some other explanation for the state

23  court's decision is more likely." <u>Id.</u> at 99-100 (citing <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803

24  (1991)).  Similarly, when a state court decision on petitioner's claims rejects some claims but

25  does not expressly address a federal claim, a federal habeas court must presume, subject to

26  rebuttal, that the federal claim was adjudicated on the merits. <u>Johnson v. Williams</u>, 568 U.S. 289,

27  298 (2013) (citing <u>Richter</u>, 562 U.S. at 98).  If a state court fails to adjudicate a component of the

28  petitioner's federal claim, the component is reviewed de novo in federal court. <u>Wiggins v. Smith</u>,

5

1   539 U.S. 510, 534 (2003).

2          Where the state court reaches a decision on the merits but provides no reasoning to

3   support its conclusion, a federal habeas court independently reviews the record to determine

4   whether habeas corpus relief is available under § 2254(d).  Stanley, 633 F.3d at 860; Himes v.

5   Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  "Independent review of the record is not de novo

6   review of the constitutional issue, but rather, the only method by which we can determine whether

7   a silent state court decision is objectively unreasonable."  Himes, 336 F.3d at 853.  Where no

8   reasoned decision is available, the habeas petitioner still has the burden of "showing there was no

9   reasonable basis for the state court to deny relief."  Richter, 562 U.S. at 98.

10          A summary denial is presumed to be a denial on the merits of the petitioner's claims.

11  Stancle v. Clay, 692 F.3d 948, 957 & n.3 (9th Cir. 2012).  While the federal court cannot analyze

12  just what the state court did when it issued a summary denial, the federal court must review the

13  state court record to determine whether there was any "reasonable basis for the state court to deny

14  relief."  Richter, 562 U.S. at 98.  This court "must determine what arguments or theories . . . could

15  have supported the state court's decision; and then it must ask whether it is possible fairminded

16  jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

17  decision of [the Supreme] Court."  Id. at 101.  The petitioner bears "the burden to demonstrate

18  that 'there was no reasonable basis for the state court to deny relief.'"  Walker v. Martel, 709 F.3d

19  925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

20          When it is clear, however, that a state court has not reached the merits of a petitioner's

21  claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

22  habeas court must review the claim de novo.  Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462

23  F.3d 1099, 1109 (9th Cir. 2006).

24  V.  Petitioner's Claims

25          *A.  Right to a Speedy Trial (Ground 2)*

26          Petitioner claims that his constitutional right to a speedy trial was violated because the

27  statute of limitations had passed, requiring relief in these proceedings.  (ECF No. 1 at 9.)

28  Respondent contends the claim is foreclosed and unavailing.  (ECF No. 6 at 7.)

6

1    Because this claim was raised in petitioner's state habeas petition, and that court denied

2    the petition on the merits without a reasoned opinion, this court's task is to independently review

3    the state court record to determine whether there was any "reasonable basis for the state court to

4    deny relief," by determining "what arguments or theories . . . could have supported the state

5    court's decision; and [] whether it is possible fairminded jurists could disagree that those

6    arguments or theories are inconsistent with the holding in a prior decision of [the Supreme]

7    Court." Richter, 562 U.S. at 98, 101.

8                              Applicable Legal Standards

9    The Sixth Amendment provides, in part: "In all criminal prosecutions, the accused shall

10   enjoy the right to a speedy and public trial."  In determining whether a defendant's constitutional

11   speedy trial rights have been violated, the court looks at (1) the length of the delay; (2) the reason

12   for the delay; (3) the defendant's assertion of the right to a speedy trial, and (4) the prejudice to

13   the defendant.  Barker v. Wingo, 407 U.S. 514, 530 (1972).  These factors are related and must be

14   considered together, as none of them are either necessary or sufficient individually to prove a

15   violation of the Sixth Amendment's speedy trial right.  Barker, 407 U.S. at 533.

16   California Penal Code section 1382 provides, in relevant part:

17              (a) The court, unless good cause to the contrary is shown, shall order
             the action to be dismissed in the following cases:
18
19             ……………………………………………………………………..

20             (2) In a felony case, when a defendant is not brought to trial within
             60 days of the defendant's arraignment on an indictment or
21             information, ….

22                              Analysis

23   Other than stating in conclusory fashion that his speedy trial rights were violated,

24   petitioner provides no further information.  More particularly, petitioner provides no relevant

25   dates nor any references to the record.  Conclusory allegations unsupported by specific facts do

26   not warrant habeas relief.  Jones v. Gomez, 66 F.3d 199, 204-05 (9th Cir. 1995); James v. Borg,

27   24 F.3d 20, 26 (9th Cir. 1994).

28   //

                                    7

1      Even ignoring the conclusory nature of petitioner's claim in this court, it lacks merit.

2                                *Relevant Background Information*

3      Following independent review, the undersigned notes that on October 26, 2011,[3]

4  petitioner entered not guilty pleas to all ten counts, and a preliminary hearing was scheduled for

5  November 3, 2011, noting no time waiver was obtained.  (2 LD 1 at 13.)

6      Following the preliminary hearing, held November 7, 2011 (2 LD 1 at 15, 39, 49-75),

7  petitioner pled not guilty to all counts as reflected in the information of November 17, 2011; trial

8  was scheduled to begin January 11, 2012.  (2 LD 1 16, 41-48 [amended information filed

9  11/7/11].)

10     A January 4, 2012, minute order reflects that the trial date was reset for February 9, 2012,

11  and includes reference to a motion to amend[4] and a release of records.[5]  (2 LD 1 at 17.)

12     A February 2, 2012, minute order reset the trial for March 8, 2012, and additionally

13  references the motion to amend and proceedings relevant to the release of records.  (2 LD 1 at

14  18.)

15     The March 8, 2012, trial date was confirmed during proceedings held March 1, 2012; a

16  notation in the minute order indicates the aforementioned records were to be reviewed by the trial

17  date.  (2 LD 1 at 18.)  Further proceedings concerning the records at issue were had on March 5

18  and 6, 2012.  (2 LD 1 at 19.)

19     On March 8, 2012, the relevant minute order reveals proceedings related to the release of

20  records continued and trial was set for March 19, 2012.  (2 LD 1 at 20.)

21     On March 19, 2012, trial of the matter was assigned to Department 19. (2 LD 1 at 20, 87.)

22  On that date, motions in limine and other preliminary matters were heard.  (2 LD 1 at 87-88.)

23  _____

24  [3] Although petitioner references no specific dates in the instant petition for writ of habeas corpus
filed in this court, a review of his state habeas petition reveals his reliance upon this date.  (2 LD
25  14 at 9.)

26  [4] The People's motion to amend the information was filed December 30, 2011. (2 LD 1 at 76-85.)
The motion was withdrawn February 2, 2012.  (2 LD 1 at 18 & 76.)

27
28  [5] The record reveals defense counsel sought records from Child Protective Services (CPS), as
well as the victim's school records.  (See, e.g., 2 LD 1 at 108-117, 133-139.)

1    Also on that same date, the People's oral motion to file an amended information was granted;

2    petitioner again entered not guilty pleas to all counts.  (2 LD 1 at 87, 89-94; 2 LD 6 at 15-16.)

3          Between March 19 and April 11, 2012, proceedings related to the defense's efforts to

4    release certain records continued, as did efforts to introduce evidence of sexual conduct of the

5    complaining witness pursuant to California Evidence Code section 782.  (2 LD 1 at 135, 139,

6    142-147, 152-159.)  Jury selection began April 11, 2011.  (2 LD 1 at 160; 2 LD 4.)

7          To reiterate, following the preliminary hearing, petitioner entered not guilty pleas to the

8    counts alleged in the information on November 17, 2011.  Employing that date for the purposes

9    of calculation, 123 days passed between it and March 19, 2012 (when the matter was assigned

10   courtroom for trial); 146 days passed between it and April 11, 2012 (when jury selection

11   commenced).  Applying the Barker factors, however, the California Supreme Court could have

12   reasonably concluded that petitioner suffered no federal constitutional violation of his Sixth

13   Amendment rights.

14         Here, as noted above, the length of the delay is 146 days, at most,  between petitioner

15   entering not guilty pleas following the preliminary hearing and jury selection.  Such a delay is not

16   presumptively prejudicial.  See United States v. Gregory, 322 F.3d 1157, 1161–62 (9th Cir. 2003)

17   ("Although there is no bright-line rule, courts generally have found that delays approaching one

18   year are presumptively prejudicial"); see also People v. Johnson, 26 Cal.3d 557, 566, n. 6 (1980)

19   (citing Barker and noting 144-day delay "not sufficient to abridge defendant's rights under the

20   federal Constitution").  Concerning the reasons for the delay, this record reveals the trial date was

21   reset several times to accommodate defense counsel's efforts to obtain CPS and school records

22   that counsel had been informed and believed would affect the victim's credibility to petitioner's

23   benefit.  And despite petitioner's assertions to the contrary in the state habeas petition, the record

24   does not reveal any improper action on the part of the prosecutor to delay trial.  See United States

25   v. Drake, 543 F.3d 1080, 1085-86 (9th Cir. 2008) (quoting Barker, 407 U.S. at 531); McNeely v.

26   Blanas, 336 F.3d 822, 827 (9th Cir. 2003) (delay attributable to defendant's own acts or to tactical

27   decisions by trial counsel will not support later claim of constitutional deprivation).

28   //

9

Even assuming petitioner asserted his right to a speedy trial (the third <u>Barker</u> factor), the California Supreme Court could have concluded petitioner was unable to meet the <u>fourth</u> Barker factor.  "The fourth factor is whether the defendant was prejudiced by the delay."  <u>United States v. Myers</u>, 930 F.3d 1113, 1120 (9th Cir. 2019).  "In considering this factor, a court should evaluate the three interests the speedy trial right was designed to protect:  (1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety and concern of the accused; and (3) to limit the possibility that the defense will be impaired."  <u>Id.</u> (quotations omitted).  "Of these three interests, 'the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.'"  <u>Id.</u> (quotations omitted).

This record reveals petitioner suffered no prejudice, and in fact, had trial counsel been restricted in her efforts to seek the CPS or school records during the time frame at issue, petitioner's defense may well have been considered to have been impaired as a result.

A court balances all four <u>Barker</u> factors in a practical, case-by-case analysis.  <u>See Barker</u>, 403 U.S. at 533.  As the Supreme Court explained, none of the four factors is "either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial.  Rather, they are related factors and must be considered together with such other circumstances as may be relevant."  <u>Id.</u>  For the reasons given above, the California Supreme Court could have reasonably concluded that petitioner's speedy trial rights were not violated.  At a minimum, fairminded jurists could disagree on the matter.  <u>Richter</u>, 562 U.S. at 98, 101.

The California Supreme Court's denial of petitioner's speedy trial claim was not contrary to, or an unreasonable application of, clearly established Supreme Court authority.  Therefore, the undersigned recommends the claim be denied.

### B.  Right to an Impartial Jury (Ground 3)

In his next claim, petitioner asserts that his constitutional right to a fair and impartial jury was violated where "several of the jurors were victims of sexual assault."  (ECF No. 1 at 9.)  Respondent contends the claim is foreclosed and unavailing.  (ECF No. 25 at 6-7.)

Because this claim too was raised in petitioner's state habeas petition, and that court denied the petition on the merits without a reasoned opinion, this court's task is to independently

1   review the state court record to determine whether there was any "reasonable basis for the state

2   court to deny relief," by determining "what arguments or theories . . . could have supported the

3   state court's decision; and [] whether it is possible fairminded jurists could disagree that those

4   arguments or theories are inconsistent with the holding in a prior decision of [the Supreme]

5   Court."  Richter, 562 U.S. at 98, 101.

6                              Applicable Legal Standards

7          The Sixth Amendment to the United States Constitution guarantees criminal defendants

8   the right to a trial by a fair and impartial jury.  Irvin v. Dowd, 366 U.S. 717, 722 (1961).  The

9   right to a jury trial is extended to state criminal trials through the Due Process Clause of the

10  Fourteenth Amendment.  Duncan v. Louisiana, 391 U.S. 145, 148-149 (1968) (holding that "the

11  Fourteenth Amendment guarantees a right of jury trial in all criminal cases which—were they to

12  be tried in a federal court—would come within the Sixth Amendment's guarantee").  A defendant

13  in a criminal case is also entitled to a jury that reaches a verdict on the basis of evidence produced

14  at trial.  Turner v. Louisiana, 379 U.S. 466, 472 (1965); Estrada v. Scribner, 512 F.3d 1227, 1238

15  (9th Cir. 2004).

16         Voir dire examinations protect the right to a fair trial by exposing biases that could result

17  in a juror being excused for cause or by providing "hints of bias" that may assist a party in

18  exercising a peremptory challenge.  McDonough Power Equipment, Inc. v. Greenwood, 464 U.S.

19  548, 554 (1984).  The Constitution "does not dictate a catechism for voir dire, but only that the

20  defendant be afforded an impartial jury."  Morgan v. Illinois, 504 U.S. 719, 729 (1992); see also

21  Skilling v. United States, 561 U.S. 358, 386 (2010) ("No hard-and-fast formula dictates the

22  necessary depth or breadth of voir dire"); United States v. Wood, 299 U.S. 123, 145-46 (1936)

23  ("Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this

24  mental attitude of appropriate indifference, the Constitution lays down no particular tests and

25  procedure is not chained to any ancient and artificial formula").

26         "Supreme Court case law in the area of juror bias is sparse."  Consequently, from a

27  constitutional perspective, "we don't know precisely what it means for a juror to be biased."

28  Williams v. Johnson, 840 F.3d 1006, 1010 (9th Cir. 2016) (citing Wood, 299 U.S. at 146).

1   However, "we do know that a juror is biased if he is unwilling to follow the law." Id.  The

2   partiality of an individual juror "is plainly [an issue] of historical fact: did a juror swear that he

3   could set aside any opinion he might hold and decide the case on the evidence, and should the

4   juror's protestation of impartiality have been believed." Patton v. Yount, 467 U.S. 1025, 1036-37

5   (1984).  Thus, the trial court's determination that a juror was impartial is entitled to a presumption

6   of correctness.  Id. at 1038; 28 U.S.C. § 2254(e).

7         When a prospective juror expressly assures that he or she can set aside any preconceived

8   opinions and render a verdict based on the evidence, a presumption of impartiality attaches.

9   Ybarra v. McDaniel, 656 F.3d 984, 992 (9th Cir. 2011) (citing Murphy v. Florida, 421 U.S. 794,

10   800 (1975)); Irvin v. Dowd, 366 U.S. at 723.  The defendant rebuts this presumption by

11   demonstrating that the juror actually held a biased opinion.  Ybarra, 656 F.3d at 992.

12                    Analysis

13         In his state habeas petition, petitioner argues "several sworn jurors (Shaltes, Harrison and

14   Brown)" were victims of sexual abuse and assault, and hence their service violated his right to a

15   fair and impartial jury.  (2 LD 14 at 17.)  Petitioner then cites to statements purporting to belong

16   to individuals with the surnames Payne, Boron and Garcia, attributing claims of sexual

17   victimization to each with citation to the transcript containing voir dire proceedings.  (2 LD 14 at

18   17.)

19         An independent review of the reporter's transcript however does not support petitioner's

20   claim, as the California Supreme Court could have reasonably concluded.

21         This record reveals Mr. Shaltes, after indicating he had been molested by an uncle, was

22   questioned by the court, defense counsel and the prosecutor. Shaltes testified he could be fair and

23   objective despite his personal experience.   (See 2 LD 4 at 11-18.)  Ms. Harrison indicated to the

24   court she had been sexually abused as a child; prior to any questioning, however, the trial court

25   excused her from further proceedings in petitioner's case.  (2 LD 14 at 49.)  Ms. Payne disclosed

26   to the court she had been "the victim of two rapes and some sexual assault."  (2 LD 4 at 51-52.)

27   After some questioning by the trial court and defense counsel, she too was ultimately excused by

28   the court after the parties stipulated to her release.  (2 LD 4 at 52-55.)  Ms. Boron was also

12

1  excused by stipulation of the parties after indicating she had been molested by a family member

2  and raped by an acquaintance.  (2 LD 4 at 55-58.)  Ms. Garcia disclosed to the court she had been

3  sexually molested as a child by a family member.  She was questioned by the trial court but,

4  ultimately, the parties stipulated to excuse Ms. Garcia from further proceedings in petitioner's

5  case.  (2 LD 4 at 58-60.)

6       Notably, while petitioner included the surname "Brown" as an individual who

7  "remain[ed] on the jury who had been [a victim] of sexual abuse and assault" (2 LD 14 at 17), a

8  review of the record revealed no prospective juror with the surname Brown, nor any voir

9  testimony by an individual with the surname Brown.

10      In summary, four of the six persons identified by petitioner (Harrison, Payne, Boron &

11 Garcia) were excused during the proceedings of April 11, 2012, and did not serve as jurors at

12 petitioner's trial.  (See also 2 LD 1 at 161 ["Lynda Harrison . . . Kathleen Payne, Paula Boron,

13 Coral Garcia . . . were excused for cause"].)  No record whatsoever of an individual identified by

14 petitioner as prospective juror "Brown" could be located on independent review.  That leaves

15 only Mr. Shaltes as even having possibly served as a juror at petitioner's trial.[6]  Once the jury was

16 selected and sworn, identifying information pertaining to the jurors and alternate jurors was

17 ordered sealed by the court.  (2 LD 1 at 166.)

18      Assuming for the sake of argument that Mr. Shaltes served as a juror during petitioner's

19 trial, petitioner fails to point to any actual bias on the part of Shaltes, but instead only facts that

20 could suggest an implied bias.  Yount, 467 U.S. at 1038.  As to implied bias, the following

21 colloquy is significant:

22          THE COURT: Number 28. Mr. Shaltes, you wanted to be heard
            privately. What is that about?
23

24          PROSPECTIVE JUROR: Well, I didn't feel right talking about that
            stuff in the court. I was about 16, my uncle molested me and, you
            know, there's a lot of family stuff related to it.
25

26          THE COURT: Let me ask you a couple of questions about that.

27

28 [6] Four alternates were selected as well.  (2 LD 1 at 165-66; 2 LD 6 at 144.)  None of the alternates
   participated in deliberations.  (2 LD 1 at 186-87, 214, 216-19; 2 LD 6 at 35-37, 46-48.)

1       PROSPECTIVE JUROR: Sure.

2       THE COURT: Did you ever report that to police or parents or adults
        or anything?

3

4       PROSPECTIVE JUROR: Yeah. We did report that. You know, he
        was -- there was some other proceedings that were going on, some
        family members that made their allegations and, you know, he has

5       children of his own. And so they were trying to figure out what's
        going on with that. And my parents suggested that I would go and

6       testify on his behalf. He said I don't think that's a good idea.

7       THE COURT: That you would testify on behalf of your uncle?

8       PROSPECTIVE JUROR: Yeah.

9       THE COURT: So there were allegations he was molesting somebody
        else in the extended family?

10

11      PROSPECTIVE JUROR: Yeah. And through all this process, he pled
        guilty. He served time. He's out. I still see him. He's a good guy, you
        know, but a little misled in the way he believed that he was trying to

12      help me with my own problems. And, you know, I understand the
        intent, the methodology just wasn't right and so he's -- he knew what

13      he did was wrong, and he didn't make a big deal, I guess.

14      THE COURT: You know what, you probably have a perceptive that
        most people don't have, that is, that people who do this are not

15      necessarily -- are not in every aspect of their lives bad people. They
        would bring cake when it's your birthday.  They sing, you know,

16      Christmas carols along with everybody else in the family. But it's this
        one part, so that why it's so important that in court what we're trying

17      to determine is whether the DA has proved the charges beyond a
        reasonable doubt, not whether somebody is a good person or a bad

18      person.

19      So what do you think, can you do that with Mr. Deanda?

20      PROSPECTIVE JUROR: Yeah.

21      THE COURT: All right.

22      PROSPECTIVE JUROR: I think so. One of his children lives with
        us now. And, you know, they don't talk to each other which, I think,

23      is frustrating because I talk to her father more than she does.

24      THE COURT: One of his children lives with you now?

25      PROSPECTIVE JUROR: Yeah.

26      THE COURT: And is that person an adult now?

27      PROSPECTIVE JUROR: Yes.

28      THE COURT: Okay. And do you two talk about what happened?

                                    14

PROSPECTIVE JUROR: Not really. I think it makes her uncomfortable. It doesn't make me uncomfortable any more. I've gone through a lot of counseling and, you know, I think it hurt my parents more than it hurt me.

THE COURT: Counsel, do you have any questions?

Ms. Mendez, do you have questions?

[DEFENSE COUNSEL] MS. MENDEZ: Yes. Understanding that you've had some personal experience with this subject nature.

Do you feel like you're still going to be able to – if you were selected as a juror -- to listen to the evidence and hold the District Attorney to their burden of proof, which is proof beyond a reasonable doubt, or do you think that you might be more inclined to maybe sympathize with -- you'll be hearing from a child witness, maybe think, well, you know, they're saying this happened, and I don't want to go against them or make them feel badly, so I should probably just hold him accountable?

PROSPECTIVE JUROR: Well, another piece of the story is that one of his children alleged that another of my uncles had done something. Nothing ever came of that. I know it was very damaging to him, and I don't know what really happened because it never went anywhere. And I don't know.

She was saying, I had a dream about something like that. It's just very sketchy to me. I don't think I would have a difficult time looking at it objectively. I know her children talk about what did happen is difficult, but I was about 16. It was still very difficult to talk to officers and stuff like that, but it doesn't mean that -- I don't think that I would have difficulty separating the things that they say from the reality of what happened.

MS. MENDEZ: Okay.

PROSPECTIVE JUROR: It's not always the same thing. People can get -- it's very destructive, and I respect that this is -- I mean, it is serious. This is, yes, a difficult time keeping work, both of them. One of them said he did something wrong. The other one says he didn't do anything wrong. And it was a difficult time with their families.

MS. MENDEZ: Are you talking about the uncles?

PROSPECTIVE JUROR: Yes, both. I know it's not a trivial matter. I can't just take it with -- with faith that they're going to tell me everything that happened and that's the truth.

MS. MENDEZ: So it sounds like you could envision a situation where just hypothetically you heard an allegation from a child regarding some sort of molest but you could – depending on what the other evidence showed maybe say, well, that hasn't been proven to me simply because they made an allegation?

15

1    PROSPECTIVE JUROR: Yeah.

2    MS. MENDEZ: Okay. Okay. I don't have any further questions.

3    THE COURT: Ms. McGill.

4    [PROSECUTOR] MS. McGILL: Hi. I think there's a couple of
5    concerns that come up when someone has a personal experience
     that's so close to the charges. And one is the one we've been talking
6    about when you think you can separate your emotions and just be
     objective.

7    The other thing, though, is also kind of referencing your personal
     experience as testimony or evidence comes into the courtroom. And
8    it's a hard thing we ask people to do. We ask them to kind of bring in
     their common experience and common sense but not necessarily
9    allow personal experiences to interfere with taking evidence and
     processing it then later discussing it with the other jurors. So it's sort
10   of a hard thing we ask you to do. It's a hard thing I think to imagine
     doing.

11
     Do you think you can separate your personal experience to the degree
12   that it wouldn't sort of keep popping up in your mind where you'd be
     comparing what you went through to what you're hearing in court.
13
14   PROSPECTIVE JUROR: Well, through all of this counseling that
     I've had, I've been trying to figure out, why am I thinking about this?
15   You know, I'm going through my own experiences. I'm married and
     I have a child. You know, I have my own difficulties dealing with
16   being a parent. And it's not hard for me to think, okay, what is this -
     - why am I thinking about this?

17   It's not something that I  - - why do these things pop into my head?
     Why am I behaving this particular way that I don't think most people
18   would behave, like being afraid to change a diaper, because I'm
     worried that I'm going to do something wrong or I don't want to hurt
19   my child. I don't want her to grow up with any similar experience
     that I had.
20
     THE COURT: Even inadvertently.
21
     PROSPECTIVE JUROR: Yes. And just like with my uncle, he
22   thought he was doing something helpful. I don't want myself to get
     into that kind of a frame of mind either. But when it comes to
23   referencing, you know, that I have a similar experience as this child
     is trying to describe, each person has a different perspective, and it's
24   not hard for me to separate myself from the perspective of other
     people. The things that some feel may call common are not exactly
25   common. I don't look at life the same way most people do. I don't --
     you know, there may be some similarities, but it's not the same. And
26   it's -- I'm not sure if that answers your question.

27   MS. McGILL: It sounds like -- how often do you think about what
     happened?
28

16

PROSPECTIVE JUROR: Let's see. Probably a couple times a week. I worry that the experience that I've had is affecting my behavior, the relationship I have with my wife, the relationship with my children and my family in general. Because I know some of the things just kind of creep in the back of my mind and makes me [behave] differently without me thinking too much about it, you know. Well, I worry that's what's happening. And like questioning my motives, why am I behaving this way? Is this am I behaving differently because of my experiences, or am I behaving differently I because of something else?

MS. McGILL: I guess my question to you would be if we're looking for sort of neutral, objective jurors on this particular case with this particular subject matter, you're the only one that can tell us whether you think you're that objective, neutral juror despite your experience or not.

PROSPECTIVE JUROR: Yeah. Well, to answer that, I think I can because I do question that. I know that's part of my experience and I know there's some form of bias so there might be. So I have to question why am -- why would I look at it in this particular light? And it's not -- I've done a lot of study in argumentation and trying to figure out why people make some arguments. So it takes a lot of detail understanding my own arguments to really know what is driving it. And when I do that, I can feel comfortable I'm make a decision that's impartial.

MS. McGILL: That's fine.

(2 LD 4 at 11-17.)

As the foregoing excerpt of the record reveals, Mr. Shaltes was forthcoming with the information from his past, clearly communicated how he felt about it, and how he felt about an allegation made by another family member against another uncle, believing he could be fair and objective by holding the government to its burden of reasonable doubt and listening to all of the evidence presented.  The California Supreme Court could have reasonably concluded that petitioner failed to rebut the presumption that Shaltes was not biased.  Yount, 467 U.S. at 1038. The state's highest court could have also reasonably concluded there was nothing to show that, in the absence of any further voir dire questioning of Shaltes, petitioner's trial was fundamentally unfair.  Morgan, 504 U.S. at 729-730; Murray, 421 U.S. at 799; Kemp, 638 F.3d at 1261.  In any event, fairminded jurists could disagree.  Richter, 562 U.S. at 98, 101.

In sum, the state court determination is neither contrary to, nor does it involve an unreasonable application of, federal precedent.  Thus, petitioner is not entitled to relief on his

1  claim and the undersigned recommends the claim be denied.

2        ### C. Confrontation of Witnesses (Ground 4)

3        Next, petitioner complains he "was not confronted by all witnesses."  (ECF No. 1 at 9.)

4  Respondent replies the claim is foreclosed and unavailing.  (ECF No. 25 at 8.)

5        Because this claim too was raised in petitioner's state habeas petition, and that court

6  denied the petition on the merits without a reasoned opinion, this court's task is to independently

7  review the state court record to determine whether there was any "reasonable basis for the state

8  court to deny relief," by determining "what arguments or theories . . . could have supported the

9  state court's decision; and [] whether it is possible fairminded jurists could disagree that those

10  arguments or theories are inconsistent with the holding in a prior decision of [the Supreme]

11  Court."  Richter, 562 U.S. at 98, 101.

12                    Applicable Legal Standards

13        The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall

14  enjoy the right...to be confronted with the witnesses against him...."  U.S. Const. Amend. VI.  It is

15  well settled that, under the Sixth Amendment, an accused has the right to present witnesses,

16  testimony and other evidence in his defense.  See Washington v. Texas, 388 U.S. 14, 19 (1967).

17  However, "[t]he accused does not have an unfettered right to offer testimony that is incompetent,

18  privileged, or otherwise inadmissible under standard rules of evidence."  Taylor v. Illinois, 484

19  U.S. 400, 409-10 (1988).

20                           Analysis

21        The habeas petition filed in this court, and specifically as to this claim, does not identify

22  what other witnesses petitioner believes he should have had an opportunity to confront.

23  It merely indicates under the "Supporting facts" heading that petitioner "was not confronted by all

24  witnesses."  (ECF No. 1 at 9.)  Respondent points out that petitioner's "state habeas petition

25  claimed lack of confrontation only as to a November 7, 2011 'preliminary hearing.' (ECF 24-14

26  at 19.)"  (See ECF No. 25 at 8.)  A review of petitioner's state habeas petition reveals that to be

27  accurate insofar as there is reference to the November 7, 2011 preliminary hearing and

28  petitioner's assertion that he "was not permitted to confront all witnesses;" there are also repeated

18

1   references to "P.J. Savage." (2 LD 14 at 19.)[7]  The preliminary hearing was conducted before

2   Judge Michael Savage whereas the trial was conducted by Judge Patrick Marlette. (See 2 LD 1 at

3   49 [preliminary hearing transcript title page].)

4         It is significant to petitioner's claim here that the "right to confrontation is basically a trial

5   right." Barber v. Page, 390 U.S. 719, 725 (1968); see also Pennsylvania v. Ritchie, 480 U.S. 39,

6   52 (1987) ("the right to confrontation is a *trial* right," italics in original); Peterson v. California,

7   604 F.3d 1166, 1170 (9th Cir. 2010) (Peterson "was not constitutionally entitled to confront

8   [witnesses] at his preliminary hearing").  Because petitioner's claim concerns the confrontation of

9   witnesses at the November 2011 preliminary hearing, rather than during his April 2012 trial, the

10  California Supreme Court could have reasonably concluded petitioner's federal constitutional

11  rights were not violated.   At a minimum, fairminded jurists could disagree on the issue.  Richter,

12  562 U.S. at 98, 101.

13        In sum, for the foregoing reasons, the undersigned recommends petitioner's claim be

14  denied.

15        **D.  Presentation of Favorable Witnesses (Ground 5)**

16        Petitioner next contends that "witnesses in [his] favor were not obtained." (ECF No. 1 at

17  9.)  Again, respondent replies petitioner's claim is foreclosed and unavailing. (ECF No. 25 at 8-

18  9.)

19        Because this claim too was raised in petitioner's state habeas petition, and that court

20  denied the petition on the merits without a reasoned opinion, this court's task is to independently

21  review the state court record to determine whether there was any "reasonable basis for the state

22  court to deny relief," by determining "what arguments or theories . . . could have supported the

23  state court's decision; and [] whether it is possible fairminded jurists could disagree that those

24  arguments or theories are inconsistent with the holding in a prior decision of [the Supreme]

25  _____

26  [7] The undersigned notes an exhibit attached in support of petitioner's claim of ineffective
    assistance of trial counsel includes a list of individuals (and further indicating whether the

27  individual was an "eyewitness" or a "character witness"), and references a date just prior to the
    preliminary hearing. (2 LD 14 at 65-66 ["Attorney Gram to PD Mendez (Accessible witness list)

28  dated November 4, 2011"].)

1  Court."  Richter, 562 U.S. at 98, 101.

2                              Applicable Legal Standards

3          "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in

4  the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution

5  guarantees criminal defendants a meaningful opportunity to present a complete defense."  Crane

6  v. Kentucky, 476 U.S. 683, 690 (1986) (citations & quotation marks omitted).  This guarantee

7  includes, "at a minimum, . . . the right to put before a jury evidence that might influence the

8  determination of guilt."  Pennsylvania v. Ritchie, 480 U.S. at 56.

9                              Analysis

10         Once again, petitioner's claim is so conclusory it is utterly empty of any supporting facts.

11  On that basis alone, the claim should be denied because conclusory allegations unsupported by

12  specific facts do not warrant habeas relief.  Jones v. Gomez, 66 F.3d  at 204-05; James v. Borg,

13  24 F.3d at 26.  It is unclear even whether petitioner intended to assert that the trial judge

14  somehow precluded him from presenting certain witnesses' testimony, thereby preventing

15  petitioner from presenting a complete defense.  But even so, trial judges have wide latitude to

16  exclude marginally relevant or even repetitive evidence without running afoul of a defendant's

17  right to present a complete defense.  Crane, 476 U.S. at 689.

18         Following independent review of this record, the undersigned concludes the California

19  Supreme Court could have reasonably concluded that the trial judge took no action that abridged

20  petitioner's right to present a complete defense.  At a minimum, on this record, "fairminded

21  jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

22  decision of [the Supreme] Court."  Richter, 562 U.S. at 98, 101.

23         **E.  Ineffective Assistance of Trial Counsel (Ground 6)**

24         Next, petitioner asserts trial counsel was ineffective.  (ECF No. 1 at 9.)  Respondent

25  maintains the claim is foreclosed and unavailing.  (ECF No. 25 at 9-10.)

26         Because this claim too was raised in petitioner's state habeas petition, and that court

27  denied the petition on the merits without a reasoned opinion, this court's task is to independently

28  review the state court record to determine whether there was any "reasonable basis for the state

1    court to deny relief," by determining "what arguments or theories . . . could have supported the

2    state court's decision; and [] whether it is possible fairminded jurists could disagree that those

3    arguments or theories are inconsistent with the holding in a prior decision of [the Supreme]

4    Court." Richter, 562 U.S. at 98, 101.

5                           Applicable Legal Standards

6            To prevail on a claim of ineffective assistance of counsel, a petitioner must show that his

7    trial counsel's performance "fell below an objective standard of reasonableness" and that "there is

8    a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

9    would have been different." Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984).

10           Under the first prong of the Strickland test, a petitioner must show that counsel's conduct

11   failed to meet an objective standard of reasonableness. Strickland, 466 U.S. at 687.  There is "a

12   'strong presumption' that counsel's representation was within the 'wide range' of reasonable

13   professional assistance." Harrington v. Richter, 562 U.S. at 104 (quoting Strickland, 466 U.S. at

14   689).  Petitioner must rebut this presumption by demonstrating that his counsel's performance

15   was unreasonable under prevailing professional norms and was not the product of "sound trial

16   strategy." Strickland, 466 U.S. at 688-89.  Judicial scrutiny of defense counsel's performance is

17   "highly deferential," and thus the court must evaluate counsel's conduct from her perspective at

18   the time it occurred, without the benefit of hindsight. Id. at 689.  "[S]trategic choices made after

19   thorough investigation of law and facts relevant to plausible options are virtually

20   unchallengeable." Strickland, 466 U.S. at 690.

21           The second prong of the Strickland test requires a petitioner to show that counsel's

22   conduct prejudiced him. Strickland, 466 U.S. at 691-92.  Prejudice is found where "there is

23   reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

24   would have been different." Id. at 694.  A reasonable probability is one "sufficient to undermine

25   confidence in the outcome." Id. at 693.  "This does not require a showing that counsel's actions

26   'more likely than not altered the outcome,' but the difference between *Strickland*'s prejudice

27   standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'"

28   Richter, 562 U.S. at 112 (quoting Strickland, 466 U.S. at 693).  "The likelihood of a different

                                             21

1   result must be substantial, not just conceivable." Id.

2                  Initial Comments

3          Following a review of petitioner's state habeas petition, the undersigned interprets

4   petitioner's claim to broadly assert defense counsel was ineffective for failing to call certain

5   witnesses and present certain evidence, failing to obtain a medical exam of the victim, and for

6   failing to conduct an investigation.  (2 LD 14 at 13.)

7                  Analysis

8                  *Failure to Call Certain Witnesses & Admit Certain Evidence*

9          In considering the previous claim, the undersigned noted an exhibit to the state habeas

10  petition identifying a number of individuals as either eyewitness or character witnesses.  A series

11  of names are listed along with a designation of "eyewitness" or "character witness."  Notably, the

12  communication to defense counsel, petitioner advises that the individuals on his list were

13  "ignorant [and] stubborn" thus she should subpoena them and "make it crystal clear they need to

14  be in court.  Also let them know if they fail to appear[] in court they will be arrested.  This is the

15  only way to get these witnesses to court." (2 LD 14 at 65.)  The undersigned will assume, for the

16  sake of argument, that petitioner wished these individuals to testify at trial.

17         Reasonable tactical decisions, including decisions with regard to the presentation of the

18  case, are "virtually unchallengeable." Strickland, 466 U.S. at 687-90.  Further, "[t]he decision

19  whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a

20  tactical decision of the sort engaged in by defense attorneys in almost every trial." United States

21  v. Nersesian, 824 F.2d 1294, 1321 (2nd Cir. 1987).  An attorney is not required to present trial

22  testimony from every witness suggested by defendant.  United States v. Wadsworth, 830 F.2d

23  1500, 1509 (9th Cir. 1987) (trial tactics are clearly within the realm of powers committed to the

24  discretion of defense counsel).

25         Simply stated, defense counsel's decision not to present the testimony of those individuals

26  identified by petitioner as eyewitnesses or character witnesses is virtually unchallengeable

27  because doing so was a reasonable tactical decision.  Where the record does not reveal counsel's

28  actual reason for making a tactical decision, the Court need not determine counsel's actual reason

22

1   so long as that decision falls within the range of reasonable representation.  See Morris v.

2   California, 966 F.2d 448, 456-57 (9th Cir. 1991), cert. denied, 506 U.S. 831 (1992).  Defense

3   counsel's decision not to call the witnesses was reasonable because there were no eyewitness to

4   petitioner's crimes against Morgan, nor are character witnesses required or even necessarily

5   permitted to testify.

6          Notably too, whatever testimony petitioner's family members and friends might have

7   given would be "suspect based on their close relationship with" petitioner.  Gonzalez v. Wong,

8   667 F.3d 965, 988 (9th Cir. 2011) (holding that trial counsel's failure to present character

9   witnesses who were family members or close friends did not constitute ineffective assistance).

10  See also Guam v. Santos, 741 F.2d 1167, 1169 (9th Cir. 1984) ("A tactical decision by counsel

11  with which the defendant disagrees cannot form the basis of a claim of ineffective assistance of

12  counsel").

13         An independent review of this record reveals that defense counsel provided reasonable

14  and effective assistance of counsel.  Certainly, petitioner has not overcome the "'strong

15  presumption' that counsel's representation was within the 'wide range' of reasonable professional

16  assistance."  Richter, 562 U.S. at 104.

17                      *Failure to Obtain a Medical Examination of the Victim*

18         Petitioner asserts defense counsel was ineffective because she did not obtain a medical

19  examination of the complaining witness.

20         First, petitioner is advised that an attorney's failure to make a meritless objection or

21  motion does not constitute ineffective assistance of counsel.  Jones v. Smith, 231 F.3d 1227, 1239

22  n.8 (9th Cir. 2000) (citing Boag v. Raines, 769 F.2d 1341, 1344 (9th Cir. 1985)).  Here,

23  petitioner's assertion assumes an examination of Morgan would have been performed had his

24  counsel but moved for such an exam.  But that is simply not the case.

25         No statutory authority exists that would require the victim of a sexual crime to undergo a

26  physical examination at the request of the accused.  Certainly, petitioner has not identified one.

27  In fact, California Penal Code section 1112 prohibits a trial court from ordering "any prosecuting

28  witness, complaining witness, or any other witness, or victim in any sexual assault prosecution to

1    submit to a psychiatric or psychological examination for the purposes of assessing his or her

2    credibility."

3         Second, and perhaps more significantly, the United States Supreme Court has never held

4    that due process demands that courts grant all requests for physical examinations of victims of

5    sexual crimes.  The Due Process Clause guarantees only a "meaningful opportunity to present a

6    complete defense." California v. Trombetta, 467 U.S. 479, 485 (1984).  It does not require that

7    every request regarding a defendant's defense be granted.  See, e.g., Gilpin v. McCormick, 921

8    F.2d 928, 931-32 (9th Cir. 1990) (state court refusal to compel child sexual assault victim to

9    undergo psychiatric examination did not violate due process & citing to Maryland v. Craig, 497

10   U.S. 836 (1990) ["We have of course recognized that a State's interest in 'the protection of minor

11   victims of sex crimes from further trauma and embarrassment' is a 'compelling one'"]).

12        Thus, even had defense counsel moved for such an examination, one is not required of

13   victims of sexual crimes and the trial court would have been under no obligation to order such an

14   examination.  See also People v. Browning, 108 Cal.App.3d 117, 125 (1980) (shooting victim

15   possessed constitutional right against unwarranted intrusion into his body for purposes of

16   extracting bullets for forensic examination).

17        Petitioner has failed to show that his counsel's failure to move for an order requiring the

18   victim to undergo a physical examination fell below an objective standard of reasonableness.

19   Strickland, 466 U.S. at 687-688.  This record establishes that counsel made a reasonable tactical

20   decision in filing a motion pursuant to Evidence Code section 782, seeking to admit evidence of

21   sexual conduct by Morgan in the form of her having watched pornography at a time other than in

22   the presence of petitioner; that motion was heard and denied by the trial court.

23        Even assuming arguendo that defense counsel's performance was deficient, petitioner

24   cannot demonstrate prejudice.  Strickland, 466 U.S. at 687.  Petitioner offers no evidence that

25   such a physical examination would have even been helpful to him.  It is pure speculation.  See

26   Dows v. Wood, 211 F.3d 480, 486-487 (9th Cir. 2000) (denying ineffective assistance of counsel

27   claim based on failure to call witnesses when no affidavits were submitted to support the assertion

28   as to what testimony would have been provided); Grisby v. Blodgett, 130 F.3d 365, 373 (9th Cir.

1  1997) ("Speculation about what an expert could have said is not enough to establish prejudice").

2  The California Supreme Court could have found similarly, to wit: that petitioner was not entitled

3  to any order requiring Morgan to undergo a physical examination, and that even were such a

4  physical examination to be conducted, petitioner had failed to demonstrate prejudice as there is

5  nothing more than the conceivability of a reasonable probability of a different result.

6  *Failure to Investigate*

7  Petitioner claims defense counsel was ineffective for a failure to investigate, citing to

8  "(Peoples Exhibit 14 & 25)." (2 LD 14 at 13.)  The undersigned assumes petitioner intended his

9  own exhibits, numbers 14 and 25, appended to the state habeas petition, to support his argument.

10  Petitioner's exhibit 14 is a list more than two dozen questions petitioner wished defense

11  counsel to "ask the panel of jurors …, if appropriate."  In addition, the exhibits reads, "If allowed,

12  suggest to the jurors to educate themselves by reading the following books…" (2 LD 14 at 98-

13  102.) Exhibit 25 is a photocopy of two unidentified photographs. (2 LD 14 at 187-188.)

14  Defense counsel has a "duty to make reasonable investigations or to make a reasonable

15  decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. "This

16  includes a duty to ... investigate and introduce into evidence records that demonstrate factual

17  innocence, or that raise sufficient doubt on that question to undermine confidence in the verdict."

18  Bragg v. Galaza, 242 F.3d 1082, 1088 (9th Cir. 2001), amended by 253 F.3d 1150 (9th Cir.

19  2001).  On the other hand, where an attorney has consciously decided not to conduct further

20  investigation because of reasonable tactical evaluations, his or her performance is not

21  constitutionally deficient.  See Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998). "A

22  decision not to investigate thus 'must be directly assessed for reasonableness in all the

23  circumstances.'" Wiggins v. Smith, 539 U.S. 510, 533 (2003) (quoting Strickland, 466 U.S. at

24  691). In order to show prejudice, petitioner must show a "reasonable probability that, but for

25  counsel's unprofessional errors, the result of the proceeding would have been different."

26  Strickland, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just

27  conceivable." Richter, 562 U.S. at 112.

28  //

25

1     The California Supreme Court could have concluded that defense counsel did not provide

2     ineffective assistance of counsel for a failure to employ the list of proposed jury voir dire

3     questions provided by petitioner.  As previously noted in the undersigned's consideration of

4     ground 3, no particular formula is required during voir dire.  Skilling, 561 U.S. at 386.  And the

5     undersigned's independent review of the voir dire proceedings reveals no constitutional flaw.

6     (See 2 LD 4 & 5.)

7     Next, as for the photocopies of photographs appended as exhibit 25 to the state habeas

8     petition, relating to petitioner's instant claim of ineffective assistance of counsel for a failure to

9     investigate, the claim is so conclusory and lacking in fact or argument that the undersigned

10    effectively has nothing to review.  See Villafuerte v. Stewart, 111 F.3d 616, 632 (9th Cir. 1997)

11    (petitioner's ineffective assistance claim denied where he presented no evidence concerning what

12    counsel would have found had he investigated further, or what lengthier preparation would have

13    accomplished); Hendricks v. Calderon, 70 F.3d 1032, 1042 (9th Cir. 1995) ("Absent an account

14    of what beneficial evidence investigation into any of these issues would have turned up,

15    Hendricks cannot meet the prejudice prong of the Strickland test").  The implication that further

16    investigation by counsel may have uncovered exculpatory evidence is insufficient to establish

17    prejudice.

18    "The question 'is not whether a federal court believes the state court's determination'

19    under the Strickland standard 'was incorrect but whether that determination was unreasonable—a

20    substantially higher threshold.'"  Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (quoting

21    Landrigan, 550 U.S. at 473).  The Strickland standard is a general standard; thus, a state court has

22    even more latitude to reasonably determine that a defendant has not satisfied that standard.

23    Mirzayance, 556 U.S. at 123.  It is a "doubly deferential judicial review that applies to a

24    Strickland claim evaluated under the § 2254(d)(1) standard."  Id.  Petitioner has not overcome the

25    deference afforded by this court to consideration of his ineffective assistance of counsel claims.

26    In conclusion, petitioner has not established defense counsel provided ineffective

27    assistance of counsel.  The California Supreme Court could have reasonably concluded defense

28    counsel's representation met an objective standard of reasonableness and that petitioner suffered

26

1   no prejudice.  Certainly, at a minimum, fairminded jurists could have disagreed on this issue in

2   light of the record.  Richter, 562 U.S. at 98, 101.  The state court determination is neither contrary

3   to, nor does it involve an unreasonable application, federal precedent.  28 U.S.C. § 2254(d).  As a

4   result, the undersigned recommends petitioner's claim be denied.

5       *F.  Denial of Right to Counsel of Choice (Ground 7)*

6      Finally, petitioner complains he was denied his "right to counsel of his choosing."  (ECF

7   No. 1 at 9.)  Respondent replies the state court's denial of his claim was reasonable, thus barring

8   federal habeas relief.  (ECF No. 25 at 10-12.)

9      The last reasoned rejection of petitioner's claim is the decision of the California Court of

10   Appeal for the Third Appellate District on petitioner's direct appeal, case number C071300, filed

11   February 21, 2017.  The state court addressed this claim as follows:

12            **DISCUSSION[fn. omitted]**

13              **I. Continuance**

14         **A. Background and Defendant's Contentions**

15        The trial court scheduled sentencing approximately five
weeks after the verdicts were rendered. On the date set for
16   sentencing, defendant requested a six-week continuance because
defendant and his mother were attempting to hire private counsel to
17   file a new trial motion. During the proceedings on defendant's
motion to continue, the trial court said, "Let's do this. Let's close this
18   up right now and treat this *kind of as a Marsden Motion*." (Italics
added.) By that point in the hearing, defendant had already
19   personally explained in open court some of his reasons for wanting
to hire a private attorney. During the in camera proceedings, the trial
20   court allowed defendant to explain three of the "most important
things" that defendant wanted to tell the court. Defendant voiced
21   three complaints about testimony and the evidence. The trial court
denied defendant's request for a continuance to hire counsel.

22

23        Defendant contends the court violated his constitutional
rights when it denied him a continuance to retain private counsel to
24   explore and possibly file a motion for a new trial. We disagree.

25               **B. Analysis**

26        Continuances are granted only upon a showing of good cause.
(*People v. Beeler* (1995) 9 Cal.4th 953, 1003.) The trial court has
27   discretion to decide whether to grant a continuance to allow a
defendant to retain an attorney of his choosing. (*People v. Jeffers*
28   (1987) 188 Cal.App.3d 840, 850.) When the trial court denies a
defendant's request for a continuance, the burden is on the defendant

1
2
3
4

to establish an abuse of that discretion. (*People v. Strozier* (1993) 20 Cal.App.4th 55, 60.) In determining whether the denial was so arbitrary as to deny due process, we look to the circumstances of each case, paying particular attention to the reasons presented to the trial court at the time the request was denied. (*People v. Courts* (1985) 37 Cal.3d 784, 791.)

5
6
7
8
9
10
11
12

Here, defendant has not carried his burden of demonstrating that the court abused its discretion in denying the continuance or that the court's decision was arbitrary. At sentencing, defendant requested a six-week continuance to locate and retain new private counsel. His mother reportedly had appointments with two different criminal defense attorneys. Neither attorney was present; nor had either been retained or made a request to substitute in. The trial court engaged the parties in an extended discussion about whether to allow the continuance. It took into account concerns about unnecessary delay, and that defendant had already had five weeks since the verdicts to hire new counsel, and had still not found anyone to represent him. Not only had new counsel not been retained, it was not clear if new counsel would be retained. And even if someone were retained, it was not clear how much time retained counsel would require to review the record to determine if a motion would even be filed.

13
14
15
16
17

Furthermore, although defendant believed he had grounds to file a motion for a new trial, the court felt it was in a position to assess these preliminary claims and it observed nothing during trial that might give rise to the filing of the motion. Nor did defendant's trial counsel believe there were grounds to file such a motion. Nonetheless, the trial court permitted defendant to personally explain his reasons for believing a new trial motion was warranted -- even closing the courtroom to the public and prosecutor on its own motion to allow defendant to speak further about his concerns.

18
19
20

We note that no issues that could have been raised as grounds for a new trial have been raised on this appeal. On this record, there was no error, constitutional or otherwise, in the court's denial of defendant's request for a continuance.

21

(People v. DeAnda, slip op. at 2-4.)

22

Applicable Legal Standards

23

The Sixth Amendment provides a criminal defendant the right to the assistance of counsel.

24

Powell v. Alabama, 287 U.S. 45, 53 (1932). This right "guarantees defendants in criminal cases

25

the right to adequate representation, but those who do not have the means to hire their own

26

lawyers have no cognizable complaint so long as they are adequately represented by attorneys

27

appointed by the courts." Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 624

28

(1989). Moreover, "the Sixth Amendment guarantees a defendant the right to be represented by

28

1    an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to

2    represent the defendant even though he is without funds."  United States v. Gonzalez-Lopez, 548

3    U.S. 140, 144 (2006).

4         Additionally, the Supreme Court has held that "only [a trial court's] unreasoning and

5    arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay'" violates

6    the Sixth Amendment.  Morris v. Slappy, 461 U.S. 1, 11-12 (1983) (quoting Ungar v. Sarafite,

7    376 U.S. 575, 589 (1964)).

8                          Analysis

9         The undersigned has reviewed the record pertaining to petitioner's claim.  Verdicts were

10   rendered April 26, 2012 (2 LD 8 at 39-45) and the trial court set the matter for sentencing June 1,

11   2012, following petitioner's waiver of right to be sentenced on May 24, 2012 (2 LD 8 at 45-46).

12        On June 1, 2012, defense counsel requested a continuance:  "In speaking with [petitioner]

13   and his mother, I have learned that she is in talks with some private attorneys exploring the idea

14   of essentially hiring someone to file a motion for new trial."  (2 LD 8 at 49.)  Acknowledging a

15   motion for new trial should be filed prior to the date set for sentencing and that she did not

16   "actually see any grounds" for such motion, defense counsel continued: "So based on

17   [petitioner's] desire to at least have consultation with a few additional attorneys for that issue, I

18   am requesting the Court to continue this sentencing, and that request would be for approximately

19   six weeks." (2 LD 8 at 49-50.)  When the trial court inquired of the attorneys with whom the

20   family had spoken, petitioner's mother indicated she had "actually had" an appointment with

21   Clyde Blackmon.  (2 LD 8 at 50.)  The People objected to the continuance, noting in part that

22   petitioner's mother had "ample time to speak to attorneys prior to the sentencing date."  (2 LD 8

23   at 51.)  When the trial court asked if the matter submitted, defense counsel advised her client

24   wished to address the court.  (2 LD 8 at 51.)

25        Thereafter, petitioner addressed the court, referencing his notes and his beliefs concerning

26   actions that should have been taken ("I believe [testimony] should have been stopped and given

27   Ms. Mendez the opportunity to actually go and talk to Megan") and evidence that should have

28   been presented ("I was reviewing several other documents in this case where it actually said that

1   there was another person present in - - during this so-called allegation case.  It wasn't brought up

2   in court at all by either Ms. Mendez or Ms. McGill;" "Not only that, the description of the panties

3   that Morgan gave was kept out.  It does not match what was shown to the jury").  (See 2 LD 8 at

4   55-56.)  Defense counsel believed petitioner was making an ineffective assistance of counsel

5   claim and indicated petitioner "would need to have another attorney review those issues;" the

6   prosecutor then indicated "the cautious and prudent thing to do would be to allow a continuance."

7   (2 LD 8 at 56.)  The following colloquy occurred thereafter:

8   THE COURT:  You know, if I'm wrong, I'll be wrong, but if we
    bring in a new attorney - - There are a couple of problems. The first
9   is, Mr. Blackmon don't come cheap, and neither does Mr. Zappettini,
    and they have to be paid.  I don't know how that arrangement is going
10  to be made given that you have been out of work for all this time.  I
    don't know if your mom or your sister work or if they are going to
11  pony that money up or not.

12  Secondly, for a new attorney to become familiar with this case, it's
    going to take more than six weeks because they have to get the
13  transcript, number one, and then review the entire transcripts.

14  If I - - I'm often called on to determine whether there is probable
    cause for an appeal, and in this case, I can't think of anything that
15  was close to being an error in this case.

16  As far as your claims that might go to - - or that you would like to go
    to ineffective assistance of counsel - - The difficulty, Mr. Deanda,
17  these days is that people in your position think that, number one, that
    they can beat this thing if the police weren't wearing the right color
18  of hat on the day that you got arrested or if some little part was left
    out of the case or if there is something that's unexplained.  We gave
19  this to 12 people and they determined beyond a reasonable doubt,
    every one of them and unanimously, of your guilt on these charges.
20
    Now, if there was somebody else there at the time that the pictures
21  were taken, in the first place, that would seem to be that would be
    immaterial; in the second place, it's not necessarily true that if you
22  say that, that that's what the jury's going to believe, because
    somebody else, the victim in this case, for instance, might say, No,
23  there wasn't.  So we are not left with anything that's different.

24  I can certainly understand how someone in your position, looking at
    the number of years that you are looking at, wants to grasp at straws,
25  and that is what you are doing. You don't want this to come. There
    are not errors in this case that I can discern.  If you want to appeal
26  based on some kind of ineffective assistance of counsel - -

27  THE DEFENDANT: I - -

28  THE COURT: - - then an attorney will be appointed for you.

30

And, lastly, this case has been five weeks since the jury verdict, and if any other attorneys were serious about taking this case, I would have expected them to make an appearance today or at least notify the Court that they have been retained and are anxious to go forward with the case, and I have none of that, so - -

THE DEFENDANT: We - - or, actually, I spoke with my mother just the other day, and we are in talking with several attorneys.

Not only that, some of the things that were said. For instance, Ms. McGill indicated that they were Jelly Belly jelly beans, and that never - -

THE COURT: That's there's what?

THE DEFENDANT: That they were Jelly Belly beans - - Jelly Belly jelly beans, and the victim actually agreed to that, when it doesn't say what type of jelly beans they actually were. By saying that, she planted suggestibility into Morgan, saying that they were, in fact, Jelly Belly beans.

THE COURT: You know, now, see, here's a perfect example. You think that you're going to beat these hundred years - -

THE DEFENDANT: No.

THE COURT: - - because there are some kind of jelly beans other than Jelly Belly jelly beans?

THE DEFENDANT: No, Your Honor. I'm not saying that. I'm just saying that misinformation was given.

THE COURT: Okay. Well, God bless you, Mr. Deanda. I can't imagine being in the situation that you are in being sentenced. I can't imagine being in the situation that you've placed yourself, in, in the commission of these crimes. I'm sure you and your mom don't want you to go to prison, but we are not going to derail this case on the kind of requests and claims that you're making.

(2 LD 8 at 56-59.) Following the denial, the trial court permitted the prosecutor to make a record of her response to petitioner's assertions as they pertained to the evidence presented at trial, to which defense counsel also responded. (2 LD 8 at 59-60.) When the trial court responded that it found "no good cause shown for a continuance in order to pursue a motion for new trial," defense counsel advised petitioner "still wishes to address the Court." (2 LD 8 at 60.) The following exchange then occurred:

THE DEFENDANT: I'm just trying to understand, Your Honor. I mean, obviously, just saying to myself, thinking this case over and over and over that I have come up with things that I believe - -

31

THE COURT:   The problem, Mr. Deanda, is that you don't understand the law, and I don't expect you to.

THE DEFENDANT: No - -

THE COURT: I mean, so - -

THE DEFENDANT: - - I don't.

THE COURT:  You have to talk to your lawyer about what is going on with your case, what your chances are of getting this new trial motion.  So if you don't understand the law and then if you don't listen to people who do understand the law, then, yeah, you are not going to understand - -

THE DEFENDANT:  Even though - -

THE COURT:  - - and that's where you are.

THE DEFENDANT:  Even though, you know, there's evidence as to, yes, I wasn't even in that residence during the time frame that was mentioned?  I have documentation showing that I wasn't even living in the house.  That was never brought up.  I mean, I have an alibi for the nighttime where the victim allegedly says these acts took place.  I can prove where I was during that time period.  That was never brought out by either side.  Nothing.  Absolutely nothing, Your Honor.

THE COURT: Well, Mr. Deanda, we are in a different situation now where, you know, I - -

THE DEFENDANT:   I tried.   I tried my best to get all this information out.

THE COURT: Let's do this.  Let's close this up right now and treat this kind of as a Marsden Motion.  I don't want you saying anything else on the record.

All right.  So we're going to - - I'm going to seal this.  …

The reason I'm doing that is so that you can say anything that you want to say and it can't be used against you.  Okay.  Because I want to hear everything that you have to say, but I think your attorney is going to have to respond to some of this.

So why don't you guys give us a couple of minutes.  We will be closed to the public while we are in this motion.

(2 LD 8 at 60-62.)  During the in camera proceedings, the trial court asked defense counsel to

respond specifically to the assertions made by petitioner and she did so; petitioner interrupted and

offered his interpretations and questions.  (2 LD 8 at 63-66.)  The following then occurred:

32

1   THE COURT:  Mr. Deanda, I wanted to give you the benefit of the doubt just to see if there was any substance with this, but my original
2   - -

3   THE DEFENDANT:  My - -

4   THE COURT:  Please be quiet.  My original impression has been confirmed, and that is that you are grasping at straws, and, frankly,
5   at this point, I don't expect you to believe anything that I say.  I don't expect to be able to convince you of this, but I'm going to confirm
6   that there is nothing here that would warrant a continuance for a motion for new trial.  So I am going to deny your motion.

7
    MS. MENDEZ:  Your Honor - -
8
    THE COURT:  I'm going to mark this spot in the transcript. [¶]  Ms.
9   Mendez.

10  MS. MENDEZ:  If there were additional specific points, I would certainly want to address them.
11
    THE COURT:  You know what?  I just wanted to get a sense of if
12  there was anything that Mr. Deanda said that would make a difference, and I expected that he, in the course of this, would give
13  me the most important things first, and the things that he has mentioned are not only not important but they would make no
14  difference whatsoever.

15  So I'm going to mark this spot in the transcript and seal the transcript, and it's not to be opened unless there's further order of the Court,
16  and we're going to open this hearing back up to the public, then, and proceed to sentencing.
17
    MS. MENDEZ:  And just for the record, I would indicate that Mr.
18  Deanda has indicated that there is more that he wants to discuss.

19  THE DEFENDANT:  I want to - -

20  THE COURT:  Mr. Deanda, be quiet.

21  Ms. Mendez, say it again.

22  MS. MENDEZ:  I was just wanting to indicate for the record that Mr. Deanda was expressing that there was more that he wanted to discuss
23  in terms of my failure to present certain evidence, so - -

24  THE COURT:  All right.  Mr. Deanda, we're going to do this once more, and what I'm going to do is, I'm going to give you three.  You
25  give me the three most important things that you want to tell me, and if those things are - - if those things are not substantive, if those
26  things don't make a difference, then I'm not going to hear anymore than those three, and I don't want you going on and on.  I want you
27  to prioritize what you are telling me, because after three, there is not going to be anything more unless one of those three is important.

28

33

1    All right.  What's the first one?

2    THE DEFENDANT: The first one, Your Honor, is that I want to ask about the camera that was supposedly used.

3

4    THE COURT:  Say that again.

THE DEFENDANT:  The camera, Your Honor, the camera that was
5    supposedly used where Ms. Doe testified, saying that it was not a digital camera in her SAFE interview.  However, when she got onto
6    the stand, she testified that it was a digital camera, and nobody objected.  Nobody - -

7
     THE COURT:  All right.  I'm going to find that that's entirely
8    collateral and immaterial and would make no difference whatsoever.

9    What's next?

10   THE DEFENDANT:  Ms. Powers' case.

11   THE COURT:  Say that again.

12   THE DEFENDANT: Ms. Powers' case, the 1998, Tiffany's case.

13   THE COURT: Oh, right.

14   THE DEFENDANT: I'm just going to throw that out there, Your Honor, the fact that it was a not-guilty verdict.  And for her to use
15   that, in my mind, that created a bias because the fact that it was not a not-guilty verdict, and it was expressed to me through my counsel
16   that it was kind of a leg up for the defense - - I'm sorry, not the defense - - but for the prosecution to use.

17
     THE COURT: Well, if that were err[or], that was not your attorney's
18   error; that would be a legal error, and I'm going to find on my own that it was not a legal error.  I considered it at the time, so that's an
19   issue that you can raise on appeal.  It's not something that would support an IAC, because your attorney objected to it.

20
     What the third?
21
     THE DEFNDANT:  I'm going to have to pick one.  I'm going to do
22   this for the third.  I'm going to go out swinging, Your Honor.

23   THE COURT:  Say that again, please.

24   THE DEFENDANT:  I said that I'm going to go out swinging on this one, Your Honor.
25
     No medical evidence, Your Honor, was presented in the case by
26   either side to support the allegations of sodomy or even attempted sodomy.  There was no expert testimony.  There was no medical
27   evidence to support this allegation, and I believe in my heart that that should have been a forefront, that should have been brought out.  I
28   even asked Ms. Mendez and Mr. Zazinski, who was my first PD.  I

1     said, You need to being this out; this is very important, and you need
      to - - You need to - -

2

3     THE COURT:  All right.  Mr. Deanda, we are done.  We are done
      here.

4     THE DEFENDANT:  I tried.

5     THE COURT:  The things - - Like I say, I don't blame you for not
      wanting to go forward on this thing, but you are grasping at straws

6     here.  I hope at some point you get some clear understanding of this
      and simply accept responsibility for the things that you have done;

7     but if you don't, there's nothing I can do about that.

8     I'm going to deny your motion.

9  (2 LD 8 at 66-70.)

10        As the foregoing excerpts establish, there was nothing unreasonable or arbitrary in the

11  trial court's denial of petitioner's motion for a continuance.

12        First, the request was not timely; despite the lapse of approximately five weeks between

13  the guilty verdicts and the date set for sentencing, petitioner failed to show new counsel had been

14  retained to present a motion for new trial, or even that such motion was imminent.  Wheat v.

15  United States, 486 U.S. 153, 157 (1988) (in a case in which the motion to substitute counsel was

16  made two days before trial, the Supreme Court upheld the denial of the motion, concluding that

17  "with the motion for substitution of counsel made so close to the time of trial, the District Court

18  relied on instinct and judgment based upon experience" and did not exceed its "broad latitude");

19  see Miller v. Blacketter, 525 F.3d 890, 896 (9th Cir. 2008) (trial court did not violate defendant's

20  right to counsel of choosing when at the time request for continuance was made, private counsel

21  had not yet been identified or retained).

22        Second, the trial court conducted a thorough inquiry into the status of any substitute

23  counsel, as well as a thorough inquiry into petitioner's bases for a new trial motion.  See Bland v.

24  California Department of Corrections, 20 F.3d 1469, 1475-1476 (9th Cir. 1994), cert. denied, 513

25  U.S. 947 (1994), overruled on other grounds by Schell v. Witek, 218 F.3d 1017 (9th Cir. 2000);

26  Jackson v. Ylst, 921 F.2d 882, 888 (9th Cir. 1990) (while a defendant has the right to make a

27  motion for new counsel based on the defendant's perception of ineffective assistance of counsel,

28  he does not have an automatic right to the substitution of counsel simply because he is dissatisfied

35

with appointed counsel's performance).

In sum, the Supreme Court has held that "only [a trial court's] unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay'" violates the Sixth Amendment. <u>Morris v. Slappy</u>, 461 U.S. at 11-12. Here, the trial court's decision was neither unreasonable nor arbitrary, nor was petitioner's request for a delay justifiable. Hence, the state appellate court's decision was not contrary to, or an unreasonable application of, clearly established Supreme Court authority. Therefore, the undersigned recommends petitioner's denial of the right to counsel of his choice claim be denied.

VI.  <u>Conclusion</u>

Accordingly, for all of the reasons set forth above, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues. A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). Any response to the objections shall be filed and served within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated:  August 27, 2021

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

dean1029.157

36